# WHALEN, COMMISSIONER OF HEALTH OF NEW YORK *v.* ROE ET AL.

No. 75–839.   Argued October 13, 1976—Decided February 22, 1977

*A. Seth Greenwald,* Assistant Attorney General of New York, argued the cause for appellant. With him on the brief were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.

*Michael Lesch* argued the cause for appellees Roe et al. With him on the brief was *Solomon Z. Ferziger.* *H. Miles Jaffe* argued the cause for appellees Patient et al. With him on the brief were *Melvin L. Wulf* and *John H. F. Shattuck.**

---

*Evelle J. Younger,* Attorney General of California, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Shunji Asari* and *Owen Lee Kwong,* Deputy Attorneys Gen-

Mr. Justice Stevens delivered the opinion of the Court.

The constitutional question presented is whether the State of New York may record, in a centralized computer file, the names and addresses of all persons who have obtained, pursuant to a doctor's prescription, certain drugs for which there is both a lawful and an unlawful market.

The District Court enjoined enforcement of the portions of the New York State Controlled Substances Act of 1972[1] which require such recording on the ground that they violate appellees' constitutionally protected rights of privacy.[2] We noted probable jurisdiction of the appeal by the Commissioner of Health, 424 U. S. 907, and now reverse.[3]

Many drugs have both legitimate and illegitimate uses. In response to a concern that such drugs were being diverted into unlawful channels, in 1970 the New York Legislature created a special commission to evaluate the State's drug-control laws.[4] The commission found the existing laws defi-

---

eral, filed a brief for the State of California as *amicus curiae* urging reversal.

*Robert Plotkin* and *Paul R. Friedman* filed a brief for the National Association of Mental Health et al. as *amici curiae* urging affirmance.

[1] 1972 N. Y. Laws, c. 878; N. Y. Pub. Health Law § 3300 *et seq.* (McKinney, Supp. 1976–1977) (hereafter Pub. Health Law, except as indicated in n. 13, *infra*).

[2] *Roe* v. *Ingraham,* 403 F. Supp. 931 (SDNY 1975). Earlier the District Court had dismissed the complaint for want of a substantial federal question. *Roe* v. *Ingraham,* 357 F. Supp. 1217 (1973). The Court of Appeals reversed, holding that a substantial constitutional question was presented and therefore a three-judge court was required. *Roe* v. *Ingraham,* 480 F. 2d 102 (CA2 1973).

[3] Jurisdiction is conferred by 28 U. S. C. §§ 1253, 2101 (b).

[4] 1970 N. Y. Laws, c. 474, amended by 1971 N. Y. Laws, c. 7. The Temporary State Commission to Evaluate the Drug Laws (hereafter T. S. C.) issued two reports which, it is stipulated, constitute part of the legislative history of the Act. The reports are the Interim Report of the Temporary State Commission to Evaluate the Drug Laws (State of New York, Legislative Doc. No. 10, Jan. 1972); and the Second Interim

cient in several respects. There was no effective way to prevent the use of stolen or revised prescriptions, to prevent unscrupulous pharmacists from repeatedly refilling prescriptions, to prevent users from obtaining prescriptions from more than one doctor, or to prevent doctors from over-prescribing, either by authorizing an excessive amount in one prescription or by giving one patient multiple prescriptions.[5] In drafting new legislation to correct such defects, the commission consulted with enforcement officials in California and Illinois where central reporting systems were being used effectively.[6]

The new New York statute classified potentially harmful drugs in five schedules.[7] Drugs, such as heroin, which are highly abused and have no recognized medical use, are in Schedule I; they cannot be prescribed. Schedules II through V include drugs which have a progressively lower potential for abuse but also have a recognized medical use. Our

---

Report of the Temporary State Commission to Evaluate the Drug Laws (Albany, N. Y., Apr. 5, 1971).

[5] *Id.*, at 3–5.

[6] The Chairman of the T. S. C. summarized its findings:

"Law enforcement officials in both California and Illinois have been consulted in considerable depth about the use of multiple prescriptions, since they have been using them for a considerable period of time. They indicate to us that they are not only a useful adjunct to the proper identification of culpable professional and unscrupulous drug abusers, but that they also give a reliable statistical indication of the pattern of drug flow throughout their states: information sorely needed in this state to stem the tide of diversion of lawfully manufactured controlled substances." Memorandum of Chester R. Hardt, App. 87a–88a.

T. S. C. Interim Report 21; T. S. C. Second Interim Report 27–44. Cal. Health & Safety Code §§ 11158, 11160, 11167 (West, 1975 and Supp. 1976); Ill. Ann. Stat., c. 56½, §§ 1308, 1311, 1312 (a) (Supp. 1977).

[7] These five schedules conform in all material aspects with the drug schedules in the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970. 21 U. S. C. § 801 *et seq.*

concern is limited to Schedule II, which includes the most dangerous of the legitimate drugs.[8]

With an exception for emergencies, the Act requires that all prescriptions for Schedule II drugs be prepared by the physician in triplicate on an official form.[9] The completed form identifies the prescribing physician; the dispensing pharmacy; the drug and dosage; and the name, address, and age of the patient. One copy of the form is retained by the physician, the second by the pharmacist, and the third is forwarded to the New York State Department of Health in Albany. A prescription made on an official form may not exceed a 30-day supply, and may not be refilled.[10]

The District Court found that about 100,000 Schedule II prescription forms are delivered to a receiving room at the Department of Health in Albany each month. They are sorted, coded, and logged and then taken to another room where the data on the forms is recorded on magnetic tapes for processing by a computer. Thereafter, the forms are returned to the receiving room to be retained in a vault for a five-year period and then destroyed as required by the statute.[11]

---

[8] These include opium and opium derivatives, cocaine, methadone, amphetamines, and methaqualone. Pub. Health Law § 3306. These drugs have accepted uses in the amelioration of pain and in the treatment of epilepsy, narcolepsy, hyperkinesia, schizo-affective disorders, and migraine headaches.

[9] Pub. Health Law §§ 3334, 3338. These forms are prepared and issued by the Department of Health, numbered serially, in groups of 100 forms at $10 per group (10 cents per triplicate form). New York State Health Department—Official New York State Prescription, Form NC-77 (8/72).

[10] Pub. Health Law §§ 3331–3333, 3339. The pharmacist normally forwards the prescription to Albany after filling it. If the physician dispenses the drug himself, he must forward two copies of the prescription to the Department of Health, § 3331 (6).

[11] Pub. Health Law § 3370.(3), 1974 N. Y. Laws, c. 965, § 16. The physician and the pharmacist are required to retain their copies for five years

594

The receiving room is surrounded by a locked wire fence and protected by an alarm system. The computer tapes containing the prescription data are kept in a locked cabinet. When the tapes are used, the computer is run "off-line," which means that no terminal outside of the computer room can read or record any information. Public disclosure of the identity of patients is expressly prohibited by the statute and by a Department of Health regulation.[12]   Willful viola-

also, Pub. Health Law §§ 3331 (6), 3332 (4), 3333(4), but they are not required to destroy them.

[12] Section 3371 of the Pub. Health Law states:

"1. No person, who has knowledge by virtue of his office of the identity of a particular patient or research subject, a manufacturing process, a trade secret or a formula shall disclose such knowledge, or any report or record thereof, except:

"(a) to another person employed by the department, for purposes of executing provisions of this article; or

"(b) pursuant to judicial subpoena or court order in a criminal investigation or proceeding; or

"(c) to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by this article to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board; or

"(d) to a central registry established pursuant to this article.

"2. In the course of any proceeding where such information is disclosed, except when necessary to effectuate the rights of a party to the proceeding, the court or presiding officer shall take such action as is necessary to insure that such information, or record or report of such information is not made public."

Pursuant to its statutory authority, the Department of Health has promulgated regulations in respect of confidentiality as follows:

"No person who has knowledge by virtue of his office of the identity of a particular patient or research subject, a manufacturing process, a trade secret or a formula shall disclose such knowledge, or any report or record thereof, except:

"(a) to another person who by virtue of his office as an employee of the department is entitled to obtain such information; or

tion of these prohibitions is a crime punishable by up to one year in prison and a $2,000 fine.[13] At the time of trial there were 17 Department of Health employees with access to the files; in addition, there were 24 investigators with authority to investigate cases of overdispensing which might be identified by the computer. Twenty months after the effective date of the Act, the computerized data had only been used in two investigations involving alleged overuse by specific patients.

A few days before the Act became effective, this litigation was commenced by a group of patients regularly receiving prescriptions for Schedule II drugs, by doctors who prescribe such drugs, and by two associations of physicians.[14] After various preliminary proceedings,[15] a three-judge District Court conducted a one-day trial. Appellees offered evidence tending to prove that persons in need of treatment with Schedule II drugs will from time to time decline such treatment because of their fear that the misuse of the computerized data will cause them to be stigmatized as "drug addicts." [16]

---

"(b) pursuant to judicial subpoena or court order in a criminal investigation or proceedings; or

"(c) to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by article 33 of the Public Health Law to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board; or

"(d) to a central registry established pursuant to article 33 of the Public Health Law." 10 N. Y. C. R. R. § 80.107 (1973).

[13] N. Y. Pub. Health Law § 12-b (2) (McKinney 1971).

[14] The physicians' associations, Empire State Physicians Guild, Inc. and the American Federation of Physicians and Dentists, articulate no claims which are severable from the claims of the named physicians. We therefore find it unnecessary to consider whether the organizations themselves may have standing to maintain these suits.

[15] In addition to the appeal from the original dismissal of the complaint, the parties took depositions which were made a part of the record and entered into a stipulation of facts.

[16] Two parents testified that they were concerned that their children

The District Court held that "the doctor-patient relationship is one of the zones of privacy accorded constitutional protection" and that the patient-identification provisions of the Act invaded this zone with "a needlessly broad sweep," and enjoined enforcement of the provisions of the Act which deal with the reporting of patients' names and addresses.[17]

## I

The District Court found that the State had been unable to demonstrate the necessity for the patient-identification requirement on the basis of its experience during the first 20 months of administration of the new statute. There was a time when that alone would have provided a basis for invalidating the statute. *Lochner* v. *New York*, 198 U. S. 45, involved legislation making it a crime for a baker to permit his employees to work more than 60 hours in a week. In an opinion no longer regarded as authoritative, the Court held the statute unconstitutional as "an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty . . . ." *Id.*, at 56.

would be stigmatized by the State's central filing system. One child had been taken off his Schedule II medication because of this concern. Three adult patients testified that they feared disclosure of their names would result from central filing of patient identifications. One of them now obtains his drugs in another State. The other two continue to receive Schedule II prescriptions in New York, but continue to fear disclosure and stigmatization. Four physicians testified that the prescription system entrenches on patients' privacy, and that each had observed a reaction of shock, fear, and concern on the part of their patients whom they had informed of the plan. One doctor refuses to prescribe Schedule II drugs for his patients. On the other hand, over 100,000 patients per month have been receiving Schedule II drug prescriptions without their objections, if any, to central filing having come to the attention of the District Court. The record shows that the provisions of the Act were brought to the attention of the section on psychiatry of the New York State Medical Society (App. 166a), but that body apparently declined to support this suit.

[17] Pub. Health Law §§ 3331 (6), 3332 (2) (a), 3333 (4).

The holding in *Lochner* has been implicitly rejected many times.[18] State legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part.[19] For we have frequently recognized that individual States have broad latitude in experimenting with possible solutions to problems of vital local concern.[20]

The New York statute challenged in this case represents a considered attempt to deal with such a problem. It is manifestly the product of an orderly and rational legislative decision. It was recommended by a specially appointed commission which held extensive hearings on the proposed legislation, and drew on experience with similar programs in other States. There surely was nothing unreasonable in the assumption that the patient-identification requirement might

---

[18] *Roe* v. *Wade*, 410 U. S. 113, 117; *Griswold* v. *Connecticut*, 381 U. S. 479, 481–482; *Ferguson* v. *Skrupa*, 372 U. S. 726, 729–730; *FHA* v. *The Darlington, Inc.*, 358 U. S. 84, 91–92.

[19] "We are not concerned, however, with the wisdom, need, or appropriateness of the legislation." *Olsen* v. *Nebraska ex rel. Western Reference & Bond Assn.*, 313 U. S. 236, 246.

[20] Mr. Justice Brandeis' classic statement of the proposition merits reiteration:

"To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold." *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (dissenting opinion) (footnote omitted).

aid in the enforcement of laws designed to minimize the misuse of dangerous drugs. For the requirement could reasonably be expected to have a deterrent effect on potential violators [21] as well as to aid in the detection or investigation of specific instances of apparent abuse. At the very least, it would seem clear that the State's vital interest in controlling the distribution of dangerous drugs would support a decision to experiment with new techniques for control.[22] For if an experiment fails—if in this case experience teaches that the patient-identification requirement results in the foolish expenditure of funds to acquire a mountain of useless information—the legislative process remains available to terminate the unwise experiment. It follows that the legislature's enactment of the patient-identification requirement was a reasonable exercise of New York's broad police powers. The District Court's finding that the necessity for the requirement had not been proved is not, therefore, a sufficient reason for holding the statutory requirement unconstitutional.

## II

Appellees contend that the statute invades a constitutionally protected "zone of privacy." [23] The cases sometimes

---

[21] The absence of detected violations does not, of course, demonstrate that a statute has no significant deterrent effect.

"From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions. Such assumptions underlie much lawful state regulation of commercial and business affairs . . . ." *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 61 (citations omitted). "Nothing in the Constitution prohibits a State from reaching . . . a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data." *Id.,* at 63.

[22] "Such regulation, it can be assumed, could take a variety of valid forms." *Robinson* v. *California,* 370 U. S. 660, 664. Cf. *Minnesota ex rel. Whipple* v. *Martinson,* 256 U. S. 41, 45; *Beauharnais* v. *Illinois,* 343 U. S. 250, 261–262.

[23] As the basis for the constitutional claim they rely on the shadows cast by a variety of provisions in the Bill of Rights. Language in prior

characterized as protecting "privacy" have in fact involved at least two different kinds of interests.[24] One is the individual interest in avoiding disclosure of personal matters,[25] and another is the interest in independence in making certain

opinions of the Court or its individual Justices provides support for the view that some personal rights "implicit in the concept of ordered liberty" (see *Palko* v. *Connecticut*, 302 U. S. 319, 325, quoted in *Roe* v. *Wade*, 410 U. S., at 152), are so "fundamental" that an undefined penumbra may provide them with an independent source of constitutional protection. In *Roe* v. *Wade*, however, after carefully reviewing those cases, the Court expressed the opinion that the "right of privacy" is founded in the Fourteenth Amendment's concept of personal liberty, *id.*, at 152–153.

"This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, *as we feel it is,* or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.*, at 153 (emphasis added). See also *id.*, at 168–171 (Stewart, J., concurring); *Griswold* v. *Connecticut*, 381 U. S. 479, 500 (Harlan, J., concurring in judgment).

[24] Professor Kurland has written:

"The concept of a constitutional right of privacy still remains largely undefined. There are at least three facets that have been partially revealed, but their form and shape remain to be fully ascertained. The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The second is the right of an individual not to have his private affairs made public by the government. The third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion." The private I, the University of Chicago Magazine 7, 8 (autumn 1976). The first of the facets which he describes is directly protected by the Fourth Amendment; the second and third correspond to the two kinds of interests referred to in the text.

[25] In his dissent in *Olmstead* v. *United States*, 277 U. S. 438, 478, Mr. Justice Brandeis characterized "the right to be let alone" as "the right most valued by civilized men"; in *Griswold* v. *Connecticut*, 381 U. S. 479, 483, the Court said: "[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion." See also *Stanley* v. *Georgia*, 394 U. S. 557; *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 79 (Douglas, J., dissenting); *id.*, at 78 (Powell, J., concurring).

kinds of important decisions.[26]  Appellees argue that both of these interests are impaired by this statute.  The mere existence in readily available form of the information about patients' use of Schedule II drugs creates a genuine concern that the information will become publicly known and that it will adversely affect their reputations. This concern makes some patients reluctant to use, and some doctors reluctant to prescribe, such drugs even when their use is medically indicated.  It follows, they argue, that the making of decisions about matters vital to the care of their health is inevitably affected by the statute.  Thus, the statute threatens to impair both their interest in the nondisclosure of private information and also their interest in making important decisions independently.

We are persuaded, however, that the New York program does not, on its face, pose a sufficiently grievous threat to either interest to establish a constitutional violation.

Public disclosure of patient information can come about in three ways.  Health Department employees may violate the statute by failing, either deliberately or negligently, to maintain proper security.  A patient or a doctor may be accused of a violation and the stored data may be offered in evidence in a judicial proceeding.  Or, thirdly, a doctor, a pharmacist, or the patient may voluntarily reveal information on a prescription form.

The third possibility existed under the prior law and is entirely unrelated to the existence of the computerized

---

[26] Roe v. Wade, supra; Doe v. Bolton, 410 U. S. 179; Loving v. Virginia, 388 U. S. 1; Griswold v. Connecticut, supra; Pierce v. Society of Sisters, 268 U. S. 510; Meyer v. Nebraska, 262 U. S. 390; Allgeyer v. Louisiana, 165 U. S. 578.  In Paul v. Davis, 424 U. S. 693, 713, the Court characterized these decisions as dealing with "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas, it has been held that there are limitations on the States' power to substantively regulate conduct."

data bank. Neither of the other two possibilities provides a proper ground for attacking the statute as invalid on its face. There is no support in the record, or in the experience of the two States that New York has emulated, for an assumption that the security provisions of the statute will be administered improperly.[27] And the remote possibility that judicial supervision of the evidentiary use of particular items of stored information will provide inadequate protection

[27] The T. S. C.'s independent investigation of the California and Illinois central filing systems failed to reveal a single case of invasion of a patient's privacy. T. S. C. Memorandum of Chester R. Hardt, Chairman, Re: Triplicate Prescriptions, New York State Controlled Substances Act, effective Apr. 1, 1973 (reproduced at App. 88a).

Just last Term in *Buckley* v. *Valeo,* 424 U. S. 1, we rejected a contention that the reporting requirements of the Federal Election Campaign Act of 1971 violated the First Amendment rights of those who contribute to minority parties:

"But no appellant in this case has tendered record evidence . . . . Instead, appellants primarily rely on 'the clearly articulated fears of individuals, well experienced in the political process.'. . . At best they offer the testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure. On this record, the substantial public interest in disclosure identified by the legislative history of this Act outweighs the harm generally alleged." 424 U. S., at 71–72 (footnote omitted).

Here, too, appellees urge on us "clearly articulated fears" about the pernicious effects of disclosure. But this requires us to assume even more than that we refused to do in *Buckley.* There the disclosures were to be made in accordance with the statutory scheme. Appellees' disclosures could only be made if the statutory scheme were *violated* as described, *supra,* at 594–595.

The fears of parents on behalf of their pre-adolescent children who are receiving amphetamines in the treatment of hyperkinesia are doubly premature. Not only must the Act's nondisclosure provisions be violated in order to stigmatize the children as they enter adult life, but the provisions requiring destruction of all prescription records after five years would have to be ignored, see n. 11, *supra,* and accompanying text.

against unwarranted disclosures is surely not a sufficient reason for invalidating the entire patient-identification program.[28]

Even without public disclosure, it is, of course, true that private information must be disclosed to the authorized employees of the New York Department of Health. Such disclosures, however, are not significantly different from those that were required under the prior law. Nor are they meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care. Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient.[29] Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

Appellees also argue, however, that even if unwarranted disclosures do not actually occur, the knowledge that the information is readily available in a computerized file creates a genuine concern that causes some persons to decline needed

---

[28] The physician-patient evidentiary privilege is unknown to the common law. In States where it exists by legislative enactment, it is subject to many exceptions and to waiver for many reasons. C. McCormick, Evidence §§ 98, 101–104 (2d ed. 1972); 8 J. Wigmore, Evidence § 2380, nn. 3, 5, 6, §§ 2388–2391 (McNaughton rev. ed. 1961).

[29] Familiar examples are statutory reporting requirements relating to venereal disease, child abuse, injuries caused by deadly weapons, and certifications of fetal death. Last Term we upheld the recordkeeping requirements of the Missouri abortion laws against a challenge based on the protected interest in making the abortion decision free of governmental intrusion, *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 79–81.

medication. The record supports the conclusion that some use of Schedule II drugs has been discouraged by that concern; it also is clear, however, that about 100,000 prescriptions for such drugs were being filled each month prior to the entry of the District Court's injunction. Clearly, therefore, the statute did not deprive the public of access to the drugs.

Nor can it be said that any individual has been deprived of the right to decide independently, with the advice of his physician, to acquire and to use needed medication. Although the State no doubt could prohibit entirely the use of particular Schedule II drugs,[30] it has not done so. This case is therefore unlike those in which the Court held that a total prohibition of certain conduct was an impermissible deprivation of liberty. Nor does the State require access to these drugs to be conditioned on the consent of any state official or other third party.[31] Within dosage limits which appellees do not challenge, the decision to prescribe, or to use, is left entirely to the physician and the patient.

We hold that neither the immediate nor the threatened impact of the patient-identification requirements in the New York State Controlled Substances Act of 1972 on either the reputation or the independence of patients for whom Schedule II drugs are medically indicated is sufficient to constitute an

---

[30] It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions. *Robinson* v. *California*, 370 U. S., at 664–665; *Minnesota ex rel. Whipple* v. *Martinson*, 256 U. S., at 45; *Barsky* v. *Board of Regents*, 347 U. S. 442, 449.

[31] In *Doe* v. *Bolton*, 410 U. S. 179, for instance, the constitutionally defective statute required the written concurrence of two state-licensed physicians, *other than* the patient's personal physician, before an abortion could be performed, and the advance approval of a committee of not less than three members of the hospital staff where the procedure was to be performed, regardless of whether the committee members had a physician-patient relationship with the woman concerned.

invasion of any right or liberty protected by the Fourteenth Amendment.[32]

## III

The appellee doctors argue separately that the statute impairs their right to practice medicine free of unwarranted state interference. If the doctors' claim has any reference to the impact of the 1972 statute on their own procedures, it is clearly frivolous. For even the prior statute required the doctor to prepare a written prescription identifying the name and address of the patient and the dosage of the prescribed drug. To the extent that their claim has reference to the possibility that the patients' concern about disclosure may induce them to refuse needed medication, the doctors' claim is derivative from, and therefore no stronger than, the patients'.[33] Our rejection of their claim therefore disposes of the doctors' as well.

---

[32] The Roe appellees also claim that a constitutional privacy right emanates from the Fourth Amendment, citing language in *Terry* v. *Ohio*, 392 U. S. 1, 9, at a point where it quotes from *Katz* v. *United States*, 389 U. S. 347. But those cases involve affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations. We have never carried the Fourth Amendment's interest in privacy as far as the Roe appellees would have us. We decline to do so now.

Likewise the Patient appellees derive a right to individual anonymity from our freedom of association cases such as *Bates* v. *Little Rock*, 361 U. S. 516, 522–523, and *NAACP* v. *Alabama*, 357 U. S. 449, 462. But those cases protect "freedom of association for the purpose of advancing ideas and airing grievances," *Bates* v. *Little Rock, supra*, at 523, not anonymity in the course of medical treatment. Also, in those cases there was an uncontroverted showing of past harm through disclosure, *NAACP* v. *Alabama, supra*, at 462, an element which is absent here.

Cf. *Schulman* v. *New York City Health & Hospitals Corp.*, 38 N. Y. 2d 234, 342 N. E. 2d 501 (1975).

[33] The doctors rely on two references to a physician's right to administer medical care in the opinion in *Doe* v. *Bolton*, 410 U. S., at 197–198, and 199. Nothing in that case suggests that a doctor's right to administer medical care has any greater strength than his patient's right to

## IV

A final word about issues we have not decided. We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files.[34] The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure

---

receive such care. The constitutional right vindicated in *Doe* was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion procedures were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution.

[34] Boyer, Computerized Medical Records and the Right to Privacy: The Emerging Federal Response, 25 Buffalo L. Rev. 37 (1975); Miller, Computers, Data Banks and Individual Privacy: An Overview, 4 Colum. Human Rights L. Rev. 1 (1972); A. Miller, The Assault on Privacy (1971). See also *Utz* v. *Cullinane*, 172 U. S. App. D. C. 67, 78–82, 520 F. 2d 467, 478–482 (1975).

of accumulated private data—whether intentional or unintentional—or by a system that did not contain comparable security provisions. We simply hold that this record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment.

*Reversed.*

Mr. Justice Brennan, concurring.

I write only to express my understanding of the opinion of the Court, which I join.

The New York statute under attack requires doctors to disclose to the State information about prescriptions for certain drugs with a high potential for abuse, and provides for the storage of that information in a central computer file. The Court recognizes that an individual's "interest in avoiding disclosure of personal matters" is an aspect of the right of privacy, *ante,* at 598–600, and nn. 24–25, but holds that in this case, any such interest has not been seriously enough invaded by the State to require a showing that its program was indispensable to the State's effort to control drug abuse.

The information disclosed by the physician under this program is made available only to a small number of public health officials with a legitimate interest in the information. As the record makes clear, New York has long required doctors to make this information available to its officials on request, and that practice is not challenged here. Such limited reporting requirements in the medical field are familiar, *ante,* at 602 n. 29, and are not generally regarded as an invasion of privacy. Broad dissemination by state officials of such information, however, would clearly implicate constitutionally-protected privacy rights, and would presumably be justified only by compelling state interests. See, *e. g., Roe* v. *Wade,* 410 U. S. 113, 155–156 (1973).

What is more troubling about this scheme, however, is the central computer storage of the data thus collected. Obviously, as the State argues, collection and storage of data

by the State that is in itself legitimate is not rendered unconstitutional simply because new technology makes the State's operations more efficient. However, as the example of the Fourth Amendment shows, the Constitution puts limits not only on the type of information the State may gather, but also on the means it may use to gather it. The central storage and easy accessibility of computerized data vastly increase the potential for abuse of that information, and I am not prepared to say that future developments will not demonstrate the necessity of some curb on such technology.

In this case, as the Court's opinion makes clear, the State's carefully designed program includes numerous safeguards intended to forestall the danger of indiscriminate disclosure. Given this serious and, so far as the record shows, successful effort to prevent abuse and limit access to the personal information at issue, I cannot say that the statute's provisions for computer storage, on their face, amount to a deprivation of constitutionally protected privacy interests, any more than the more traditional reporting provisions.

In the absence of such a deprivation, the State was not required to prove that the challenged statute is absolutely necessary to its attempt to control drug abuse. Of course, a statute that did effect such a deprivation would only be consistent with the Constitution if it were necessary to promote a compelling state interest. *Roe* v. *Wade, supra; Eisenstadt* v. *Baird,* 405 U. S. 438, 464 (1972) (WHITE, J., concurring in result).

MR. JUSTICE STEWART, concurring.

In *Katz* v. *United States,* 389 U. S. 347, the Court made clear that although the Constitution affords protection against certain kinds of government intrusions into personal and private matters,* there is no "general constitutional 'right to

---

*See 389 U. S., at 350 n. 5:

"The First Amendment, for example, imposes limitations upon govern-

privacy.' . . . [T]he protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." *Id.*, at 350–351 (footnote omitted).

MR. JUSTICE BRENNAN's concurring . opinion states that "[b]road dissemination by state officials of [the information collected by New York State] . . . would clearly implicate constitutionally protected privacy rights . . . ." *Ante*, at 606. The only possible support in his opinion for this statement is its earlier reference to two footnotes in the Court's opinion, *ibid.*, citing *ante*, at 598–600, and nn. 24–25 (majority opinion). The footnotes, however, cite to only two Court opinions, and those two cases do not support the proposition advanced by MR. JUSTICE BRENNAN.

The first case referred to, *Griswold* v. *Connecticut*, 381 U. S. 479, held that a State cannot constitutionally prohibit a married couple from using contraceptives in the privacy of their home. Although the broad language of the opinion includes a discussion of privacy, see *id.*, at 484–485, the constitutional protection there discovered also related to (1) marriage, see *id.*, at 485–486; *id.*, at 495 (Goldberg, J., concurring); *id.*, at

---

mental abridgment of 'freedom to associate and privacy in one's association.' *NAACP* v. *Alabama,* 357 U. S. 449, 462. The Third Amendment's prohibition against the unconsented peacetime quartering of soldiers protects another aspect of privacy from governmental intrusion. To some extent, the Fifth Amendment too 'reflects the Constitution's concern for . . . ". . . the right of each individual 'to a private enclave where he may lead a private life.' " ' *Tehan* v. *Shott,* 382 U. S. 406, 416. Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution."

As the Court notes, *ante*, at 599–600, and n. 26, there is also a line of authority, often characterized as involving "privacy," affording constitutional protection to the autonomy of an individual or a family unit in making decisions generally relating to marriage, procreation, and raising children.

500 (Harlan, J., concurring in judgment), citing *Poe* v. *Ullman,* 367 U. S. 497, 522 (Harlan, J., dissenting); 381 U. S., at 502–503 (WHITE, J., concurring in judgment); (2) privacy *in the home,* see *id.,* at 484–485 (majority opinion); *id.,* at 495 (Goldberg, J., concurring); *id.,* at 500 (Harlan, J., concurring in judgment), citing *Poe* v. *Ullman, supra,* at 522 (Harlan, J., dissenting); and (3) the right to use contraceptives, see 381 U. S., at 503 (WHITE, J., concurring in judgment); see also *Roe* v. *Wade,* 410 U. S. 113, 169–170 (STEWART, J., concurring). Whatever the *ratio decidendi* of *Griswold,* it does not recognize a general interest in freedom from disclosure of private information.

The other case referred to, *Stanley* v. *Georgia,* 394 U. S. 557, held that an individual cannot constitutionally be prosecuted for possession of obscene materials in his home. Although *Stanley* makes some reference to privacy rights, *id.,* at 564, the holding there was simply that the *First* Amendment—as made applicable to the States by the Fourteenth—protects a person's right to read what he chooses in circumstances where that choice poses no threat to the sensibilities or welfare of others, *id.,* at 565–568.

Upon the understanding that nothing the Court says today is contrary to the above views, I join its opinion and judgment.